# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

KONNI KATHLEEN ELLEN,

Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

Case No. 1:16-cv-01196-SAB

ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL

(ECF Nos. 14, 15, 16)

**I.**

**INTRODUCTION**

Plaintiff Konni Kathleen Ellen ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from Hashimoto's Disease, plantar fasciitis, shoulder pain, premature ovarian failure, osteoporosis, psoriasis, psoriatic arthritis, degenerative disc disease and affective disorder. For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 6, 8.)

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on December 11, 2012. (AR 102.) Plaintiff's application was initially denied on July 5, 2013, and denied upon reconsideration on December 3, 2013. (AR 143-145, 147-151.) Plaintiff requested and received a hearing before Administrative Law Judge William J. King, Jr., ("the ALJ"). Plaintiff appeared for a video hearing on December 18, 2014. (AR 33-102.) On January 27, 2015, the ALJ found that Plaintiff was not disabled. (AR 14-26.) The Appeals Council denied Plaintiff's request for review on June 15, 2016. (AR 1-4.)

### A. Relevant Hearing Testimony

Plaintiff testified at a video hearing on December 18, 2014. (AR 39-47, 49-89; 92-93.) Plaintiff was born on June 11, 1970. (AR 39.) Plaintiff is married and lives with her husband. (AR 39.) Plaintiff has insurance through her husband who is employed. (AR 39.) Plaintiff received unemployment benefits after she was laid off in March of 2005. (AR 40.) Plaintiff has a driver's license and drives. (AR 40.) Plaintiff has a high school diploma and has attended two years of college, although she did not receive a college degree. (AR 40.) Plaintiff is still attending college. (AR 40.) Plaintiff received a certificate in bookkeeping in 2006, but never worked as a bookkeeper. (AR 41.) Plaintiff has never had a job that lasted more than a year since she was laid off in 2005. (AR 46.)

Plaintiff took college classes with the intent of going into nursing, but with her health issues is looking into other areas to find something that she can do. (AR 41.) Plaintiff did not currently have a major. (AR 41.)

Plaintiff last worked three or four weeks prior to the hearing. (AR 41.) Starting the end of May 2014, Plaintiff worked for Reading Cinemas as a supervisor directing snack bar employees. (AR 41, 43.) She was handling cash deposits, working on the registers, serving customers. (AR 41-42.) She would be on her feet for the majority of the shift which was about 90 percent of the time. (AR 42, 44.) Plaintiff would handle from 5 to 25 pounds and would ask for help if it was heavier than that. (AR 44.) Plaintiff was working while she was in college and

was supposed to only be working one day per week per her doctor's note. (AR 42.) She worked a seven and a half hour shift. (AR 42.) Her doctor put her off work for a month in August and then she went back to work. (AR 83.) Plaintiff quit because they were demanding that she work more than one day per week. (AR 43.)

When Plaintiff went back to work she was hoping to be able to work three to four days a week, but found she could not get out of bed until the next shift. (AR 84.) That was when Dr. Trussel took her off work and she went back with the agreement that she would only work one day per week because it was interfering with her homework. (AR 84.)

While she was working Plaintiff was going to school for six hours or less two days per week. (AR 44-45.) Plaintiff was also doing homework two hours per day five days a week. (AR 45.) Plaintiff would do her homework for twenty minutes and then take a break to put dishes in the dishwasher or something that did not require her to sit before going back to her homework. (AR 85.) The regular school year was August through December and January through May. (AR 45.) Plaintiff was also taking classes during the summer. (AR 45.) Plaintiff has been attending school fulltime on and off since she was laid off. (AR 46.) The last year she could handle a fulltime semester was 2011. (AR 45.)

Prior to working at the Cinema, Plaintiff had worked one or two days for Quadknoff in 2012. (AR 43.) She attended two training classes for safety and then worked one day in the field. (AR 46.) Plaintiff worked as a surveyor. (AR 43.) She would walk through the foothills where Chevron and other oil companies were going to put a drilling site surveying for endangered species. (AR 43-44.) When she took the job she did not realize how physical it was and they were working in the heat and fire suits. (AR 44.) There were no bathrooms and after a day of working she could not get out of bed. (AR 44.)

Plaintiff also worked part-time as receptionist for three months at a retirement home. (AR 92.)

The summer prior to that Plaintiff worked at a convenience store. (AR 47.) Her primary goal was to finish school to start her career. (AR 47.) Plaintiff was looking for jobs during this time that were similar to her skill set rather than her education. (AR 47.) About three years

prior, Plaintiff volunteered a couple of times at Friends of Kern County Animal Control. (AR 77.) She used to attend their events. (AR 77.) She would talk to people about spaying and neutering their animals. (AR 78.)

Plaintiff filed for disability in the summer of 2012 after she quit working for Quadknoff because her psoriasis went from being on the back of her scalp to covering her whole body. (AR 87.) She developed pustular psoriasis on her hand and the bottoms of her feet. (AR 87.) It is a painful condition that is under more control now. (AR 87.) However, Plaintiff still has psoriasis on the palms of her hands and feet. (AR 87.) She tries not to wash her hands unless she has to because it can cause cracking and bleeding. (AR 87.) When Plaintiff was working at the movie theater her thumbs or the palms of her hands would be cracked and bleeding when she was working the concession stand. (AR 87.)

Plaintiff has inflammatory arthritis that causes problems with her right and left hands. (AR 49.) Plaintiff has a tendency to drop things with her left hand because of the pain. (AR 49-50.) She also has swelling in the right thumb joint and the middle finder of her left hand. (AR 50.) Plaintiff has stiffness, swelling, and flare-ups. (AR 51.) Plaintiff has times when her symptoms are better and times when they are worse. (AR 51.) She has been having this condition with her hands since 2010. (AR 51.) The frequency and duration of the flare-ups has gotten worse since 2010. (AR 51.) When the symptoms started it was just a nuisance, but now Plaintiff has trouble writing. (AR 51.) It never goes away, but at times it is worse and writing causes it to flare-up. (AR 52.) Using a keyboard does not cause it flare-up, but using a mouse does. (AR 52.) Plaintiff's hand pain ranges from a 2 or 3 to 7 out of 10. (AR 52-53.) Avoiding activity with her hand causes the symptoms to subside. (AR 53.) Plaintiff will also put cold packs on her hands for five minutes at a time. (AR 53.)

Plaintiff's biggest problem is her back. (AR 53.) She has had problems with her back since she was in her teens. (AR 53.) Plaintiff has stiffness and soreness if she does a lot of sitting. (AR 54.) Plaintiff's back pain ranges from 4 or 5 to 9 out of 10 at its worst. (AR 54.) Prolonged sitting aggravates her back pain. (AR 54.) When she was working at the theater her back would hurt when she sat to count money. (AR 55.) Plaintiff's back pain was also

aggravated by bending, lifting, and stooping. (AR 55.) It is also aggravated by washing dishes or cutting up vegetables. (AR 56.) A good night's sleep will alleviate her pain somewhat and also avoiding whatever activity caused her back to start hurting. (AR 55.) When Plaintiff was doing homework she would quit or only do twenty minutes at a time, in class she would get up and stand up. (AR 55.)

Plaintiff also has had problems with her left foot since 2009. (AR 56.) Plaintiff has a nerve issue where the left toes join the foot. (AR 56-57.) Her foot pain ranges from 1 or 2 to 7 or 8 out of 10. (AR 57.) Her foot pain is made worse by walking when wearing shoes that are not orthotic. (AR 58.) Not putting pressure on the foot relieves the pain. (AR 58.) Dr. Zimmerman did an MRI and wanted to do surgery. (AR 57.)

Plaintiff has had a burning sensation on the left side of her ribs since the beginning of summer. (AR 58.) They have improved since she started back on the Humira shots. (AR 58.)

Plaintiff suffers fatigue which she has been told is from her thyroid. (AR 85.) She is scheduled to have a cyst in her neck drained on February 10. (AR 85.) Plaintiff was just diagnosed with interstitial cystitis. (AR 88.) It is a painful condition that requires her to watch what she eats. (AR 88.)

Plaintiff has suffered from depression since her teens. (AR 59.) The symptoms get better and worse, but are worse as the panic attacks have increased the last two and a half years. (AR 59.) Plaintiff's depression causes her to not want to leave the house. (AR 59.) She will have suicidal thoughts. (AR 60.) She does not socialize and does not have friends. (AR 60.) Plaintiff has panic attacks, self-isolation, and suicidal thoughts. (AR 60.) Plaintiff also has anxiety that goes with her panic attacks. (AR 60.)

On some days, Plaintiff is afraid to leave the house because she is afraid she will have a panic attack or feels one coming on. (AR 60.) Plaintiff has a panic attack at least once a week because the medication she is taking to prevent them is actually causing her to have panic attacks. (AR 61.) The length of her panic attack depends on the environment and if she realizes it is happening she can remove herself from the situation and get it under control before it is full blown. (AR 61.) It takes her one to two minutes to get a panic attack under control if it is not

full blown. (AR 61.) When she has a full blown attack she will get on the ground and her husband will get the phone to call 9-1-1. (AR 61.) But, he has never had to call 9-1-1. (AR 61.) Most of the time Plaintiff is able to limit her panic attacks to a few minutes. (AR 61.) Last year Plaintiff had an attack in class and they stopped class and she had to be taken to the clinic. (AR 62.) At the clinic, they put her on oxygen and checked to make sure she was not having heart issues. (AR 62.) Plaintiff has not had another attack at school due to her understanding of how to deal with them and she has actually walked away and avoided going to class. (AR 62.) Since September, Plaintiff has missed three days of class. (AR 62.) Plaintiff is unable to attend school fulltime due to her panic attacks. (AR 63.)

Plaintiff is able to maintain As when she takes one class at a time. (AR 63.) The last time Plaintiff went to school fulltime was in the fall of 2011 or spring of 2012. (AR 64.) Fulltime would be 12 units or more which would be three to four classes. (AR 64.) Plaintiff started taking one class at a time due to her panic attacks and back pain. (AR 65.) Plaintiff attended a class where she received tutoring because she qualified under the student's with disabilities program. (AR 86.) Plaintiff took a one day CPR class last year. (AR 86.)

Plaintiff sees a rheumatologist for her arthritis, an endocrinologist, a chiropractor, a family practitioner, a naturopathic doctor, a urologist, and a psychiatrist. (AR 66-67, 88.) Plaintiff sees her rheumatologist every three months. (AR 67.) She is prescribed Humira and her husband gives her injections at home. (AR 68.) Plaintiff went for a year without seeing the endocrinologist and just started seeing her again. (AR 68.) She is seeing her every one to two months. (AR 68.) The endocrinologist is monitoring Plaintiff's pituitary and thyroid. (AR 68.) Plaintiff sees her chiropractor two to three times per week for manipulations. (AR 68-69.) Plaintiff sees her family practitioner once a month and is being referred to physical therapy. (AR 69.) Plaintiff started seeing a psychiatrist in April of this year and sees him once a month. (AR 70-71.) Several years ago, Plaintiff received mental health treatment at Kaiser and had treatment on and off in her teens and 20s. (AR 70.) She also has seen a marriage and family therapist once or twice a month for five years. (AR 70.) Plaintiff was going to physical therapy for her foot and back but her sessions ran out and she will start again in January. (AR 71.)

Plaintiff was going to school twice a week for one class before the semester finished. (AR 72.) Plaintiff has signed up for one class for the upcoming semester. (AR 72.) Plaintiff's class is supposed to last three hours a day, but the teacher was letting them out after an hour and a half. (AR 72.) Plaintiff is supposed to do 12 hours of homework per week at a minimum. (AR 72.) Plaintiff generally goes to bed around 8 or 9. (AR 73.) She wakes up when the sun comes up but tries to go back to sleep. (AR 73.) Sometimes she is able to go back to sleep and sometimes she cannot. (AR 73.) Plaintiff gets up around 8 or 9. (AR 73.) Plaintiff will make herself a smoothie for breakfast. (AR 73-74.) If she is not going to school she will lie down and watch television. (AR 74.)

Plaintiff has two dogs and she cleans up after them. (AR 74.) Plaintiff walks the smaller dog. (AR 74.) Some weeks she walks the dog two or three times, other weeks not at all. (AR 74.) Sometimes they walk a couple of blocks to her mother-in-law's house and then will sit and rest for a bit before walking back home. (AR 74.) If Plaintiff cannot make it back home her husband will come pick her up or her mother-in-law will take her home. (AR 74-75.) Plaintiff joined a gym and had gone four times since January. (AR 75.) Plaintiff joined a bowling league in March, but had to quit after going four times. (AR 75-76.) Her back and tendinitis in her right shoulder flared up. (AR 76.) Plaintiff took an adaptive fitness class three times at school. (AR 76.) It was designed for people who have problems and they are able to do as little or as much as they can during the class. (AR 76.)

Plaintiff does not do a very good job taking care of her house. (AR 77.) Her husband or her mother-in-law will help her. (AR 77.) Plaintiff sometimes cooks and her husband helps. (AR 77.) Plaintiff has a small garden box in which she grows herbs. (AR 77.) She will water it once in a while, but it has an automatic sprinkler so she does not have to very often. (AR 77.)

Plaintiff goes to movies that are back-pain worthy. (AR 78.) Most of the time she waits for the movie to come out on video so she can either lie down or sit because she is not comfortable going to a movie theater and sitting. (AR 78.) When they go out to dinner, Plaintiff asks for a booth so she can adjust herself and sit in a way to minimize her back pain. (AR 79.) Plaintiff does not go to church or her husband's sporting events. (AR 78.) Plaintiff does not

socialize with friends, but does socialize with her mother-in-law. (AR 78.) Plaintiff is not spending as much time with her sisters because they have chronic mental illness and she cannot handle being around them. (AR 78.)

Plaintiff will go to the grocery store on her way home or between doctor's appointments. (AR 79.) She leaves her purse in the car because it hurts her back to carry it through the store. (AR 79.) If Plaintiff goes for a major trip, such as to Costco, her husband goes with her to lift the heavy items. (AR 79.) Plaintiff goes to the big shops once a week with her husband for an hour. (AR 79.)

Plaintiff is able to lift 15 pounds but cannot lift 25 pounds. (AR 80.) If her foot is not flaring up, Plaintiff can stand for two to three hours. (AR 80.) At the theatre, she was on her feet for seven and a half hours and her foot would flare up within the first couple hours. (AR 81.) Her foot would then hurt for 24 hours. (AR 81.) Plaintiff is able to walk for several blocks before needing to rest. (AR 81.) Sometimes Plaintiff is only able to sit for fifteen minutes and other times she can sit for an hour. (AR 82.) Plaintiff has problems bending at the knees and at the waist. (AR 82.) Plaintiff can climb stairs as long as she has a handrail. (AR 82.)

A vocational expert, Kathleen Spencer, also testified at the hearing. (AR 90-100.)

**B. ALJ Findings**

The ALJ found that Plaintiff met the requirements to remain insured through June 30, 2014 and must establish disability on or before that date to be entitled to a period of disability or disability benefits. (AR 17.) The ALJ made the following findings of fact and conclusions of law.

- Plaintiff last met the insured status requirements of the Social Security Act on June 30, 2014.
- Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of June 22, 2012 through her date last insured of June 30, 2014.
- Through the date last insured, Plaintiff had the following severe impairments: degenerative disc disease and affective disorder.
- Through the date last insured, Plaintiff did not have an impairment or combination of

impairments that met or medically equal the severity of one of the listed impairments.

- After careful consideration of the entire record, through the date last insured, Plaintiff had the residual functional capacity to perform less than a full range of light work. Plaintiff can lift and carry 20 pounds occasionally and 10 pounds frequently; can sit, stand, and walk 6 hours in an 8 hour day; and can occasionally climb, balance, stoop, kneel, crouch, and crawl. Plaintiff can perform tasks that can be learned in less than 30 days involving no more than simple, short instructions, and simple work-related decisions with few work place changes and can perform work in which interpersonal contact is incidental to work performed.
- Plaintiff is unable to perform any past relevant work.
- Plaintiff was born on July 11, 1970, and was 44 years old, which is defined as a younger individual age 18-49, on the date last insured.
- Plaintiff has at least a high school education and is able to communicate in English.
- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not the Plaintiff has transferrable job skills.
- Through the date last insured, considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.
- Plaintiff was not under a disability as defined in the Social Security Act, at any time from June 22, 2012, the alleged onset date, through June 30, 2014, the date last insured.

(AR 19-25.)

**III.**

**LEGAL STANDARD**

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm

simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

**IV.**

**DISCUSSION AND ANALYSIS**

Plaintiff contends that the ALJ erred in rejecting the opinion of consultative examiner, Nancy Nikkel, Ph.D. who opined that Plaintiff had a Global Assessment of Function ("GAF") Score[2] of 50 and did not take into consideration her "fair to poor" mental limitations and therefore the Residual Functional Capacity ("RFC") is under inclusive of her mental limitations. Plaintiff also argues that the ALJ's assessment of Plaintiff's activities of daily living leaves much to be desired.

Defendant counters that the ALJ properly evaluated Dr. Nikkel's opinion and is not required to adopt all of Dr. Nikkel's findings. Defendant contends that the ALJ provided a specific and legitimate reason to reject the GAF finding and properly relied on the opinions of the reviewing doctors who found that the the RFC was consistent with Dr. Nikkel's opinion.

Plaintiff responds that the fair to poor findings by Dr. Nikkel is commensurate with a moderate to marked degree of functional loss and there is no evidence to permit performance of simple work activities as the ALJ assessed in the RFC. Plaintiff argues that the agency opinions actually contradict the opinion of Dr. Nikkel.

**A. Legal Standard**

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d

[2] "A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations." Cornelison v. Astrue, 2011 WL 6001698, at *4 n.6 (C.D. Cal. Nov. 30, 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 32 (4th ed.2000)).

821, 830-831 (9th Cir. 1995). "Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)(3)). The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas, 278 F.3d at 957.

### B. The ALJ provided Legitimate and Specific Reasons to Reject Dr. Nikkel's GAF Assessment

Dr. Nikkel did a comprehensive psychiatric examination of Plaintiff on June 13, 2013. (AR 371-377.) Plaintiff drove herself to the appointment and arrived early. (AR 371.) Plaintiff's attitude was appropriate during the interview. (AR 371.) Plaintiff endorsed symptoms of depression and anxiety. (AR 371.) Plaintiff reported that her symptoms began as a teenager and they were pretty severe. (AR 371.) Plaintiff stated that she remembered banging her head against the wall trying to hurt herself. (AR 371.) Plaintiff also reported a family history of depression and that sometimes her symptoms are better and sometimes they are worse. (AR 372, 373.)

Plaintiff reported depressed mood, anhedonia, weight changes, sleep problems, fatigue, feelings of worthlessness and guilt, difficulty concentrating and thinking, and thoughts of death. (AR 372.) Plaintiff stated that she was feeling more helpless lately and that she had begun to have panic attacks. (AR 372.) Plaintiff reported her panic attacks occur once a week. (AR 372.) Her symptoms include chest pain and shortness of breath. (AR 372.) Plaintiff also reported

experiencing numbness in her arms. (AR 372.) She reported that she can feel the panic attacks coming on and can control them better now. (AR 372.) Plaintiff states that her symptoms occur daily and they are worse than when they first began. (AR 372.) Plaintiff described her depression as moderate to severe and she has been treated with medication and counseling. (AR 372.)

Plaintiff claimed to have been in counseling all her life. (AR 372.) She started receiving counseling when she was fourteen and is currently receiving counseling once a week. (AR 372.) She has been on and off psychiatric medications since she first started treatment at age 14. (AR 372.) Plaintiff is currently trying to treat her psychiatric symptoms holistically. (AR 372.)

Plaintiff reported that she attended high school through twelfth grade and received her diploma at adult school. (AR 373.) She denied receiving special education classes in high school. (AR 373.) Plaintiff has been attending Bakersfield College for a while and has completed approximately two years of classes. (AR 373.) Plaintiff wanted to pursue nursing but does not know if she can physically handle the job. (AR 373.)

Plaintiff reported significant employment history including managing fast food restaurants from the ages of 19 to 22. (AR 373.) Plaintiff then managed a shoe store for seven years. (AR 373.) Plaintiff managed a movie theater for five years and a swap meet until she was laid off when it closed. (AR 373.) Plaintiff's more recent work history is less stable. (AR 373.) She worked from 2007 to 2008 as a sales person. (AR 373.) In 2009, Plaintiff worked as a receptionist. (AR 373.) Plaintiff left the job because she thought she had another job but it did not pan out. (AR 373.) The previous summer Plaintiff worked for three days as a surveyor, but the work was too physical in the heat. (AR 373.)

Plaintiff reported that she gets up between 8 and 8:30 and will attempt to do normal activities such as cleaning, cooking, and laundry. (AR 373.) Plaintiff's mother-in-law and husband help when they can. (AR 373.) Plaintiff goes to class at Bakersfield College. (AR 374.) If she is having a depressed day she will go to her sisters or her mother-in-law's house because she does not want to be alone. (AR 374.) Plaintiff will sometimes watch a movie or television. (AR 374.) Plaintiff denied having any current hobbies. (AR 374.) Plaintiff reported

that she had to quit a job two year's prior because she had panic attacks. (AR 374.) Plaintiff used to volunteer at animal rescue, but does not feel that she can handle the job anymore. (AR 374.) Plaintiff spends time on Facebook. (AR 374.) Plaintiff reports that she does not feel well, does not want to be around anyone, and is trying to force herself to get better and to get out of the house. (AR 374.)

Plaintiff's hygiene was good and her eye contact was appropriate. (AR 374.) Her attitude was cooperative and motor activity was unremarkable. (AR 374.) Plaintiff's thought processes were tight, logical, and goal-oriented. (AR 374.) Speech form was normal in rate and pace with relevant content. (AR 374.) Articulation was clear, and velocity and volume were normal. (AR 374.) Plaintiff denied psychotic symptoms and there were no indications of hallucinations or delusions. (AR 374.) Plaintiff denied suicidal or homicidal ideation but her thought content included themes of hopelessness. (AR 374.)

Plaintiff reported her mood as depressed. (AR 374.) Affect was congruent with stated mood and constricted. (AR 374.) Plaintiff reported that her sleep was poor and she was having trouble falling and staying asleep. (AR 374.) Plaintiff reported that her appetite was okay and decreased. (AR 374.)

Plaintiff was oriented in all spheres. (AR 374.) Her immediate and past memory were intact, and recent memory was fair. (AR 374-375.) Plaintiff's fund of knowledge was within normal limits. (AR 375.) Plaintiff was able to perform simple mathematical calculations correctly. (AR 375.) Plaintiff's concentration was within normal limits. (AR 375.) Plaintiff had difficulty differentiating appropriately. (AR 375.) Plaintiff's judgment and insight were fair. (AR 375.)

Plaintiff was diagnosed with major depressive disorder, recurrent, severe; panic disorder without agoraphobia; and a GAF of 50.[3] (AR 375-376.) Dr. Nikkel found that Plaintiff appeared to respond to questions in an open and honest manner and did not appear to be exaggerating

---

[3] A GAF range of 41–50 reflects "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Vanbibber v. Carolyn, No. C13-546-RAJ, 2014 WL 29665, at *1 (W.D. Wash. Jan. 3, 2014) (quoting American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders Multiaxial Assessment 30, 32 (4th ed. Text rev. 2000) (DSM-IV)).

symptoms or that there were inconsistencies throughout the examination. (AR 376.) Plaintiff's symptoms were found to be severe. (AR 376.) Plaintiff's problem is treatable but the likelihood of recovery is poor. (AR 376.) Given the chronic nature of her mental health condition, Dr. Nikkel opined that it was unlikely to improve within the next 12 months. (AR 376.)

Dr. Nikkel opined that Plaintiff is capable of managing her own funds. (AR 377.) Plaintiff has the ability to perform simple and repetitive tasks as well as detailed and complex tasks. (AR 377.) Plaintiff has a fair ability to accept instructions from supervisors and interact with co-workers and the public, as evidenced by her work history and depressed affect. (AR 377.) Plaintiff is able to perform work activities on a consistent basis without special or additional instruction. (AR 377.) Plaintiff has good ability to maintain regular attendance in the workplace. (AR 377.) Plaintiff has a fair to poor ability to complete a normal workday/workweek without interruptions from a psychiatric condition and is not able to deal with the usual stress encountered in a competitive workplace, as evidenced by the severity of her symptoms of depression and anxiety. (AR 377.)

The ALJ considered Dr. Nikkel's opinion that Plaintiff had a fair to poor ability to complete a normal workday or workweek without interruptions from a psychiatric condition, fair ability to accept instructions from supervisors and coworkers and the public, and is not able to deal with the usual stress encountered in a competitive workplace. (AR 23.) The ALJ also considered the GAF score of 50, stating that a rating of 41-50 reflects serious impairment in social, occupational or school functioning, and a rating of 51-60 reflects moderate limitations in social, occupational, or school functioning. (AR 23.) The ALJ found that Plaintiff's activities of daily living indicate greater functioning than is reflected in a GAF score of 50. (AR 24.)

The ALJ considered that Plaintiff reported that she was able to clean, cook, and is independent with her activities of daily living. (AR 23, 364.) While Plaintiff argues that the ALJ ignored the fact that she is able to do these things at her own pace, there is other evidence that the ALJ relied on to show that her daily activities indicate greater functioning than found by Dr. Nikkel.

Plaintiff is taking a class at Bakersfield College. (AR 23, 374.)

In September 2013, Plaintiff reported that she got a second dog and was walking a lot with her dog. (AR 23, 602.) Plaintiff argues that she is not individually responsible for the dogs and the report says she is “walking with them.” Plaintiff reported on September 16, 2013, that she got a second dog in July, who is very active and she is walking a lot with them. (AR 602.) The ALJ reasonably found that Plaintiff was referring to the dogs when she stated “them,” and not another person. Similarly, Plaintiff testified at the hearing that sometimes they walk a couple of blocks to her mother-in-law’s house and then will sit and rest for a bit before walking back home. (AR 74.) If Plaintiff cannot make it back home her husband will come pick her up or her mother-in-law will take her home. (AR 74-75.) The evidence does support the ALJ’s interpretation that Plaintiff was walking a lot with her dogs.

The ALJ also considered that Plaintiff had worked after her alleged onset date. (AR 23.) The ALJ found that Plaintiff was trapping feral cats for money in April 2013. (AR 23.) On May 31, 2013, Plaintiff reported that she was considering trapping cats again for money, which does indicate that she was previously doing this work. (AR 418.)

The ALJ also noted that Plaintiff was working part-time in September 2012. (AR 23.) On November 16, 2012, Plaintiff reported that she started school and a new job in the same week and was taking two classes. (AR 550, 551.)

The ALJ noted that Plaintiff was also working in July 2014. (AR 23.) On July 15, 2014, Plaintiff reported that she was very busy as a supervisor at her job, “ ‘Non stop hell on wheels’ running everywhere, walking on concrete.” (AR 645.) Plaintiff reported that she did not want to have to leave work. (AR 646.) It gives her somewhere to go and something to do and she likes being there although it is very hard on her body. (AR 646.)

The ALJ provided specific and legitimate reasons to reject the opinion of Dr. Nikkel that Plaintiff’s symptoms were severe that are supported by substantial evidence in the record.

**C. The ALJ Properly Relied on the Agency Physicians’ Opinions Which Found the RFC to be Consistent with Dr. Nikkel’s Opinion**

Plaintiff also argues that the inconsistency with Dr. Nikkel’s opinion is apparent because Dr. Nikkel found that Plaintiff had “fair to poor” ability to complete a normal

workday/workweek without interruptions from her psychiatric symptoms and an inability to deal with the usual stress encountered in a competitive workplace. Dr. Nikkel's findings are not a residual functional capacity assessment, but those findings are used to determine Plaintiff's residual functional capacity assessment.

Contrary to Plaintiff's assertion, it is not apparent that Dr. Nikkel's opinion is inconsistent with the ALJ's findings. Dr. Nikkel opined that Plaintiff had a "fair to poor" ability to complete a normal workday/workweek without interruptions from her psychological symptoms. As Plaintiff and the ALJ realized Dr. Nikkel's opinion placed some of Plaintiff's limitations right at the cusp between moderate and severe/marked. As discussed above, the ALJ provided legitimate and specific reasons to determine that Plaintiff's symptoms were not severe, but were moderate. "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954.

Further, the ALJ gave the greatest weight to the state agency medical consultant opinions finding that they were consistent with the objective medical findings and Plaintiff's activities of daily living and the consultative examination. (AR 24.) The weight to be afforded a non-examining physician's opinion depends upon the degree to which the physician provides supporting explanations for his opinion. Garrison, 759 F.3d at 1012 (citing 20 C.F.R. § 404.1527(d)(3)).

On June 26, 2013, Dr. Kelly reviewed the medical record and found that Plaintiff had mild restrictions to activities of daily living; and moderate difficulties in maintaining social functioning and concentration, persistence, and pace. (AR 112.) Dr. Kelly gave great weight to Dr. Nikkel's opinion because it was consistent with totality of evidence and it provided the most recent and comprehensive exam. (AR 113.) Dr. Kelly found the opinion evidence about limitations and restrictions was consistent with the totality of the evidence. (AR 113.) Dr. Kelly conducted a Mental Residual Functional Capacity Assessment. (AR 116-118.) Dr. Kelly found that Plaintiff was not significantly limited in her ability to carry out very short and simple instructions, to perform activities within a schedule, maintain regular attendance, and be punctual

within customary tolerances, to work in coordination with or in proximity to others without being distracted by them, and was moderately limited in her ability to carry out detailed instructions, maintain concentration and pace for extended periods, sustain ordinary routine without special supervision, and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 116-117.)

Dr. Kelly found that Plaintiff's ability to interact appropriately with the general public, ask simple questions or requests, get along with coworkers and per without distracting them or exhibiting behavioral extremes and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness were not significantly limited. (AR 117.) Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors was moderately limited. (AR 117.)

Dr. Kelly found that Plaintiff was not significantly limited in her ability to be aware of normal safety hazards and take normal precautions, and travel in unfamiliar places or use public transportation. (AR 117.) Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, and set realistic goals or make plans independent of others. (AR 117) Plaintiff's limitations arose from mood and anxiety symptoms. (AR117.)

Dr. Kelly opined that after review, the overall medical evidence of record supports an unskilled mental rating. (AR 118.) There is medical evidence of record where Plaintiff has mood and sleep disorder diagnoses. (AR 118.) There is no formal mental health medical evidence of record other than the June 2013 consultative examination. (AR 118.) Dr. Kelly found that although Plaintiff may have some problems, there is no objective evidence that she cannot engage in simple, routine, repetitive tasks where contact is minimal. (AR 118.) Dr. Nikkel notes that Plaintiff is capable of performing simple/detailed tasks, has fair ability to accept instructions, and is able to maintain attendance. (AR 118.) Activities of daily living show some impairment but Plaintiff is functional. (AR 118.)

Dr. Kelly noted that at the consultative examination, Plaintiff reports she does chores, cooks, cleans, attends college, and interacts with others. (AR 118.) Plaintiff's activity of daily

living submitted show the claimant attends to hygiene, cooks, cleans, drives, goes out alone, shops, and manages money. (AR 118.) Dr. Kelly opined that Plaintiff is able to perform work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; and supervision required is simple, direct and concrete (unskilled). (AR 118.) Dr. Kelly gave great weight to the opinion evidence from Dr. Nikkel's June 2013 consultative examination finding the opinion evidence about Plaintiff's limitations and restrictions is consistent with the totality of the evidence and with the findings in this rating. (AR 118.)

Similarly, on November 29, 2013, Dr. Bradley reviewed the record on reconsideration and found that Dr. Nikkel's opinion evidence about Plaintiff's limitations and restrictions is consistent with the totality of the evidence and the findings in this rating. (AR 138.) While Plaintiff argues that the residual functional capacity assessment did not contain all limitations opined by Dr. Nikkel, the residual functional capacity findings need not be identical to the relevant limitations but must be consistent with them. Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1223 (9th Cir. 2010). "[A]n ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008).

While Plaintiff ultimately is arguing that the RFC fails to adequately capture all her mental limitations, the ALJ relied on the medical opinions of the agency physicians who both opined that the RFC is consistent with the limitations opined by Dr. Nikkel. The Court finds that the ALJ did not err in determining that Plaintiff maintained the ability to perform tasks that can be learned in less than 30 days involving no more than simple, short instructions, and simple work-related decisions with few work place changes and can perform work in which interpersonal contact is incidental to work performed.

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, IT IS HEREBY ORDERED that Plaintiff's appeal from the

decision of the Commissioner of Social Security is DENIED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Konni Kathleen Ellen. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: **August 16, 2017**

UNITED STATES MAGISTRATE JUDGE